UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

THOMAS W. FARR,                        )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )    No.:   3:16-CV-387-TAV-HBG
                                       )
CENTURION OF TENNESSEE, LLC, et al.,   )
                                       )
            Defendants.                )

## MEMORANDUM OPINION

Before the Court is plaintiff's pro se complaint for violation of civil rights pursuant to 42 U.S.C. § 1983 [Doc. 2], and motion for leave to proceed *in forma pauperis* [Doc. 1]. In addition to these filing, the Court is also in possession of plaintiff's request that counsel be appointed to assist in the litigation of the instant action [Doc. 2 p. 23]. For the reasons discussed below, Plaintiff's request to proceed *in forma pauperis* [Doc. 1] will be **GRANTED**. His request for counsel will be **DENIED** and complaint [Doc. 2] will be **DISMISSED** *sua sponte*.

### I.     BACKGROUND

#### A.     Procedural

Plaintiff, a former inmate of the Morgan County Correctional Complex (MCCX), filed the instant action under 42 U.S.C. § 1983 against several defendants, including: private medical care providers Centurion of Tennessee, LLC and Corizon, Inc.; physicians Dr. Crump, Dr. C. Singleton, and Dr. Niner; MCCX Health Administrators Dan Walker and Lynndy Houston-Fagan; MCCX Job Coordinator Rhonda Armes; MCCX Wardan Shawn Phillips; MCCX Deputy Wardan of Treatment Stanton Heidle; and Tennessee Department of Corrections (TDOC) Medical Director Kenneth Williams [Doc. 2 p. 1]. Plaintiff also states in the Complaint that he is "attempting to get the names of other defendants that worked with Corizon[,] . . .

Centurion[,] . . . and TDOC" and that he plans to include the same in his lawsuit "if [he] succeed[s] in getting their names" [*Id.*].

Plaintiff asserts the following claims: "medical negligence" against Centurion, Corizon, Dr. Singleton, Administrator Walker, and Administrator Houston-Fagan; "deliberate indifference" resulting in "cruel and unusual" pain against Centurion, Corizon, Dr. Crump, Dr. Singleton, Administrator Walker, Administrator Houston-Fagan, Coordinator Armes, Warden Phillips, Deputy Warden Heidle, and Director Williams; "conspire[acy] to "retaliate" against Coordinator Armes, Warden Phillips, and Deputy Warden Heidle; and "professional malpractice" against Dr. Niner [*Id.*]. He seeks the following relief: $30 million from Centurion, $20 million from Corizon, $5 million from Dr. Crump, $5 million from Dr. Singleton, $3 million from Administrator Houston-Fagan, $3 million from Administrator Walker, $1 million from Dr. Niner, $1 million from Warden Phillips, $1 million from Deputy Warden Heidle, and $250,000 from Coordinator Armes [*Id.* at 24]. He also asks for individual monetary awards against several of the yet-to-be named Centurion and Corizon medical directors and an unnamed John Doe correctional officer [*Id.*]. In light of the individualized requests for monetary award and in light of the nature of the allegations articulated in the Complaint, the Court construes plaintiff's suit as one against the named defendants in their individual capacities and not an action against those individuals in their official capacity, i.e., a suit against the State of Tennessee [*Id.* at 17 (explaining that the instant action is not one against "state agencies")]. *See, e.g.*, *Perlfrey v. Chambers*, 43 F.3d 1034, 1038 (6th Cir. 1995) (explaining that a suit brought against a public, government official will not be construed as seeking damages against a defendant in his individual capacity unless the claim for individual liability is clearly and definitively set forth in the pleading); *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991) (explaining courts must

assume that an individual is being sued in his official capacity absent evidence the plaintiff intended he be sued in an individual capacity).

      **B.**      **Factual**

Plaintiff is an inmate in the custody of TDOC and was incarcerated at MCCX at all times relevant to the instant suit; he was transferred to South Central Correctional Facility (SCCF) in September of 2015 and is currently incarcerated at Northeast Correctional Complex (NECX) [*Id.* at 3, 6, 14]. In November of 2012, TDOC transported plaintiff to Nashville General Hospital for "cataract removal and gl[a]ucoma" eye surgery [*Id.* at 7]. Dr. Singleton performed the surgery, placing a "blister" on plaintiff's left eyeball to serve as a "pool for fluids" and cutting "a canal from the blister to the corner of [plaintiff's] eye" in an effort to control pressure [*Id.*].

In February of 2013, the blister began to "fill-up with the fluids form [plaintiff's] eye, and the blister formed into a "bubble" on the eyeball; as a result, plaintiff began to suffer eye irritation [*Id.*]. He scheduled an appointment with Dr. Crump, the "MCCX eye doctor," for February 13, 2013 [*Id.*]. At that appointment, Dr. Crump conducted an examination of the irritated eye and told Plaintiff that he would "put in a request for [plaintiff] to go to an eye specialist" [*Id.*]. Plaintiff received no additional information until his second appointment with Dr. Crump on April 10, 2013, at which time Dr. Crump informed plaintiff that MCCX denied the request [*Id.*]. Dr. Crump suggested that plaintiff "experiment with different eye drops and see if they will help" [*Id.*]. Despite follow-up appointments on May 15, 2013, June 12, 2013, and June 28, 2013, the irritation worsened and bubble grew [*Id.*]. Plaintiff characterizes the condition of his eye at the time as "pain[ful] . . . red eye" and again requested that MCCX staff take him to a specialist [*Id.*].

3

Over the next few months, plaintiff made two more attempts to see a specialist about the condition of his left eye: once when he spoke to Dr. Higgs, an MCCX physician—which plaintiff claims he followed up with an "inmate information request"—and again when his wife called an unnamed TDOC medical director about her husband's need for a specialist [*Id.* at 8]. The unnamed director told plaintiff's wife that she would investigate and get an appointment if needed [*Id.*].

Dr. Crump examined plaintiff for the sixth time on November 13, 2013 [*Id.*]. At that appointment, plaintiff noted that he was "suffering every day" and requested that MCCX staff take him to an eye specialist [*Id.*]. Plaintiff had another appointment with Dr. Crump on February 19, 2014; while there, he reiterated the painful nature of his condition and his desire to have the bubble removed [*Id.*]. Slightly less than one month later—on April 12, 2014, Dr. Crump examined plaintiff for the eighth time and MCCX staff finally took plaintiff back to Dr. Singleton [*Id.* at 9].

After examining the bubble, Dr. Singleton asked "why [plaintiff] wasn't [brought] back to [see] her" when it was first discovered and explained that he could have suffered eye damage as a result of the eye drops proscribed by Dr. Crump [*Id.*]. Plaintiff asked Dr. Singleton to remove the bubble, but she refused because his "eye pressure and . . . sight [was] good in both eyes" and removal of the bubble would require a second surgery [*Id.*]. She did agree, however, to provide plaintiff with an eye gel to counter the irritation [*Id.* at 9–10]. Plaintiff acknowledges that the eye gel helped "ease the irritation each day," but maintains that some irritation remained [*Id.* at 10].

In July of 2014, Dr. Crump examined plaintiff for a ninth time [*Id.*]. Plaintiff asked Dr. Crump to check whether or not Dr. Singleton scheduled a surgery and, if not, to either schedule

4

one or request that MCCX staff take plaintiff to see another specialist [*Id.*]. One month later, plaintiff made the same request to Dr. Lane, another MCCX physician [*Id.*]. After several more months passed without response, plaintiff asked his sister to contact TDOC about the status of his surgery [*Id.*]. When she did, an unnamed TDOC director told her that plaintiff "was already scheduled [for] an appointment with Dr. Singleton [for] sometime after the first of the year" [*Id.*].

MCCX staff took plaintiff to his appointment with Dr. Singleton in April of 2015 [*Id.* at 11]. Plaintiff reiterated his earlier request for surgery, but Dr. Singleton declined. She explained that she did "not want to do surgery to remove" the bubble because plaintiff's "vision . . . and eye pressure" were "good" and she had "concern[s] about possible complications" [*Id.*]. Despite his objections, plaintiff returned to MCCX with no surgery or follow-up appointment scheduled [*Id.*].

Several months after his appointment with Dr. Singleton—on June 23, 2015, plaintiff woke up missing "about half of the vision in [his] left eye" and seeing "numerous black wigglely [sic] things" [*Id.* at 12]. Plaintiff reported the situation and MCCX staff immediately took him to the "old clinic" for examination by Dr. Niner [*Id.*]. After that examination, Dr. Niner agreed that something was wrong with plaintiff's left eye and that it looked "serious" [*Id.*]. Noting that Dr. Crump would be at MCCX the following day, Dr. Niner scheduled plaintiff an appointment and asked that he return to his cell [*Id.*]. Plaintiff agreed with the proposed course of action [*Id.*].

The next morning—on June 24, 2015, plaintiff woke up missing "all vision in his left eye" [*Id.*]. Again, he reported the situation and MCCX staff immediately took him to the "old clinic" [*Id.*]. When they arrived, an unnamed correctional officer refused plaintiff entry to the clinic, informed plaintiff that Dr. Crump would not be in until later in the day, and told plaintiff

5

he needed to return after Dr. Crump arrived [*Id.*]. Several hours later, a different unnamed correctional officer allowed plaintiff to go to the "main clinic," where plaintiff was told that Dr. Crump "ha[d] already left for the day" [*Id.*]. When plaintiff returned to the "old clinic," Dr. Lane conducted an examination [*Id.*]. He acknowledged that plaintiff's blindness was "a serious emergency" and walked plaintiff back down to the "main clinic" for a follow-up examination by Dr. Higgs [*Id.*]. Dr. Higgs agreed that the condition was "really serious" and concluded that plaintiff "need[ed] help." In accordance with that determination, he arranged for the MCCX staff to take plaintiff to the University of Tennessee Medical Center (UTMC) emergency room [*Id.*].

When plaintiff arrived at the UTMC emergency room, an eye specialist, Dr. Shuler, examined his left eye [*Id.* at 12–13]. Dr. Shuler diagnosed the condition as follows: plaintiff's blindness resulted from a "rare infection behind [his] left eyeball" that was probably caused by the unremoved bubble [*Id.* at 13]. After obtaining plaintiff's consent, Dr. Shuler performed a "minor procedure," removing the bubble and injecting the infection with antibiotics [*Id.*]. The entire process took less than thirty minutes [*Id.*]. After the procedure, Dr. Shuler advised plaintiff that he was unlikely to regain sight in his left eye and that that eyeball was at risk of drying out, i.e., becoming a "pain eye" [*Id.*]. Dr. Shuler proscribed drops to counteract that process [*Id.*].

Several months after the procedure at UTMC—in September of 2015, plaintiff learned that he was being transferred from MCCX to SCCF because he "ha[d] over 10 years to complete [on his] sentence and [did not] have a job" [*Id.*]. Plaintiff suggests that Coordinator Armes, Warden Phillips, and Deputy Warden Heidle conspired to arrange the transfer and thereby deprive him access to UTMC in retaliation for grievances that plaintiff submitted in preparation

6

for the instant federal lawsuit and complaining about what he perceived as "shorts" in his pay for prison work [*Id.* at 15–17]. Relevant to the second condition cited as justification for the transfer—lack of employment within the prison system, plaintiff appears to suggest that Coordinator Armes and Warden Phillips retaliated against him by refusing to "open-up another [medical sensitive] job slot in order that [plaintiff could] support [him]self by working and getting inmate pay" [*Id.* at 16].[1]

## II. ANALYSIS

### A. Motion to Proceed In Forma Pauperis

Under the Prison Litigation Reform Act ("PLRA"), any prisoner who files a complaint in a district court must tender the full filing fee or file (1) an application to proceed *in forma pauperis* without prepayment of fees and (2) a certified copy of his inmate trust account for the previous six-month period. 28 U.S.C. § 1915(a)(2). Plaintiff submitted a fully compliant application to proceed *in forma pauperis* on June 24, 2015 [Doc. 1], and it appears from that application that he lacks sufficient financial resources to pay the $350.00 filing fee. Accordingly, Plaintiff's motion for leave to proceed *in forma pauperis* [Doc. 1] is **GRANTED** and, pursuant to 28 U.S.C. § 1915, the Clerk is **DIRECTED** to file this action without the prepayment of costs or fees or security therefor as of the date the Complaint was received. Because plaintiff has failed to state a viable claim for relief under § 1983, however, process shall not issue and the action will be **DISMISSED**.

---

[1] Plaintiff provides several pages of information about how he attempted to apply for numerous jobs, thought that he gained a job only to discover later that he did not, and was unable to continue in his original position because of his medical classification [Doc. 2 pp. 14–16]. The Court omits much of this information from its recitation of facts because plaintiff does not identify this initial deprivation of a job as a manifestation of retaliation and the information is irrelevant to plaintiff's medical negligence, deliberate indifference, and professional malpractice claims.

7

### B. Request for Appointment of Counsel

Without identifying specific facts or circumstances in support of his motion, Plaintiff requests the Court appoint counsel to represent him in the current § 1983 action [Doc. 2 p. 23]. The appointment of counsel in a civil case is a matter within the discretion of the Court. *Childs v. Pellegrin*, 822 F.2d 1382, 1384 (6th Cir. 1987). After careful consideration of Plaintiff's motions, including the type and nature of the case, its complexity, and Plaintiff's ability to prosecute his claim, this Court is of the opinion that counsel is not necessary at this time to ensure his claims are fairly heard. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).

### C. *Sua Sponte* Screening Standard

Under the PLRA, district courts must screen prisoner complaints and *sua sponte* dismiss those that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See Benson v. O'Brian*, 179 F.3d 1014, 1015–16 (6th Cir. 1999) ("Congress directed the federal courts to review or 'screen' certain complaints *sua sponte* and to dismiss those that failed to state a claim upon which relief could be granted [or] . . . sought monetary relief from a defendant immune from such relief.").

To state a claim under 42 U.S.C. § 1983, the plaintiff must establish that he was deprived of a federal right by a person acting under color of state law. *Black v. Barberton Citizens Hospital*, 134 F.3d 1265, 1267 (6th Cir. 1998); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992); *see also Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990) ("Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere."). In other words, the plaintiff must plead facts sufficient to show: (1) the deprivation of a right, privilege, or immunity secured to him by the United States

Constitution or other federal law; and (2) that the individual responsible for such deprivation was acting under color of state law. *Gregory v. Shelby Cty.*, 220 F.3d 433, 441 (6th Cir. 2000).

### 1. "Medical Negligence" and "Professional Malpractice"

Plaintiff identifies his causes of action against several of the defendants as "medical negligence" or "professional malpractice." All six of these claims—the negligence claims against Centurion, Corizon, Dr. Singleton, Administrator Walker, and Administrator Houston-Fagan, and the malpractice claim against Dr. Niner—will be dismissed *sua sponte* because negligence and professional malpractice are not cognizable causes of action under § 1983. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Moss v. Minor*, No. 3:11-cv-425, 2011 WL 6258451, at *1 (Dec. 14, 2011) ("Negligence, even gross negligence, will not support a § 1983 claim for denial of medical care."). Because no other claims against Dr. Niner exist, he will be dismissed.

### 2. "Deliberate Indifference" Leading To "Cruel and Unusual Pain"

The Court interprets plaintiff's claim that several defendants demonstrated deliberate indifference to his condition and thereby caused cruel and unusual pain as an action for deliberate indifference to a serious medical need in violation of the Eighth Amendment. The cause of action is cognizable under § 1983, but plaintiff has not stated a viable claim against any of the defendants.

Establishing the deprivation of a federal right in the Eighth Amendment medical context requires evidence that that acts or omissions of an individual operating under the color of state law were "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Thus, under the *Estelle* standard, "[a] constitutional claim for denial of

9

medical care has [both] objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). The objective component requires proof the inmate is suffering from a sufficiently serious medical need, such that "he [was] incarcerated under conditions posing a substantial risk of serious harm." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To be sufficiently serious, the medical need must be either (1) obvious to a layperson or (2) supported by medical evidence, like a physician's diagnosis. *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991)); *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995). With regard to the former, the question is whether an average person without specialized medical training would easily recognize the need for immediate professional treatment by observing the person or being told of his symptoms. *Johnson v. Karnes*, 398, F.3d 868, 874 (6th Cir. 2005).

The subjective component requires proof that the prison official possessed a sufficiently culpable state of mind. *Bargery*, 207 F.3d at 867. "A defendant possess[es] a sufficiently culpable state of mind when he acts with deliberate indifference." *Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005), *abrogated on other grounds in Pearson v. Callahan*, 555 U.S. 223 (2009). Conduct undertaken with "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Karnes*, 398 F.3d at 875 (quoting *Farmer*, 511 U.S. at 836). Thus, deliberate indifference requires more than mere negligence; it requires a mental state amounting to criminal recklessness. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839–40). To prove this standard, a plaintiff must allege facts sufficient to establish that the defendant: (1) "perceived the facts from which to infer substantial risk to the prisoner," (2) "did in fact draw the inference;"

10

and (3) "then disregarded that risk." *Id.* at 591 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

### a. Centurion and Corizon

Centurion and Corizon are businesses with which a state or local government can contract for purposes of providing medical care to individuals incarcerated at jails and prisons within its jurisdiction. As an agent of the municipality, they are subject to the same standards of liability.

When a § 1983 claim for deliberate indifference is made against a municipality, the Court must analyze two distinct issues: (1) whether the plaintiff's harm was caused by an underlying constitutional violation; and (2) if so, whether the municipality is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). The Court finds that it need not address the former because, regardless, plaintiff has not pled facts sufficient to satisfy the latter.

Respondeat superior is not a viable theory of liability under § 1983, *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 101 (6th Cir. 1991), and, as a result, Centurion and Corizon can only be held responsible if the underlying violation arose from an act taken pursuant to one of its policies or customs. *Id.*; *see also Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J., concurring) (explaining a municipality can only be held liable for harms that result from a constitutional violation when that underlying violation resulted from "implementation of [its] official policies or established customs"). To plead such an action, the plaintiff must (1) identify an articulable policy or custom, (2) connect that policy or custom to the municipality, and (3) show that he incurred his constitutional injury due to execution of the identified policy. *See e.g.*, *Gregory v. Shelby Cty.*, 220 F.3d 433, 441 (6th Cir. 2000), *overruled on other grounds*

11

*in Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001) (explaining the third prong requires proof that municipal conduct "was the moving force behind [his] injury"). Examples of municipal polices and customs include: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Spears*, 589 F.3d at 256.

Nowhere in the Complaint does plaintiff identify a custom or policy, link that policy or custom to Centurion or Corizon, or allege that the same is responsible for his constitutional injury. As a result, plaintiff does not state a viable Eighth Amendment claim against Centurion or Corizon. Because there are no other claims against either defendant, both entities will be dismissed.

### b. Crump, Singleton, Walker, and Houston-Fagan

Plaintiff's allegations against Dr. Crump, Dr. Singleton, Administrator Walker and Administrator Houston-Fagan are more developed. However, the Court need not determine whether plaintiff's claims against the foregoing individuals satisfy the objective prong—sufficiently serious medical condition, because he has not pled facts which to satisfy the second.

With regard to Dr. Crump, plaintiff details nine appointments, examinations, and treatment sessions between February of 2013 and July of 2014, several of which ended with Dr. Crump attempting to schedule plaintiff an appointment with Dr. Singleton or another specialist. Even if the Court accepts the allegation that Dr. Crump recognized the "seriousness" of plaintiff's condition, plaintiff has not alleged any facts indicating that Dr. Crump deprived him of medical care or deliberately disregarded a known and serious risk. To the contrary, Dr. Crump provided plaintiff with continuous medical care and acquiesced in numerous requests that he

attempt to schedule plaintiff an appointment with an eye specialist. Plaintiff cannot hold Dr. Crump liable under § 1983 for the fact that MCCX staff denied several of those requests or for the fact that the medical attention provided—experimentation with eye drops—proved futile. *See, e.g.*, *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (explaining that, where the prisoner received some medical attention and the dispute is over the adequacy of that treatment, courts are reluctant to second guess medical judgments of the treating physician or nurse).

Dr. Singleton performed the original surgery responsible for creating the blister and canal that eventually turned into a bubble and led to the infection. At the appointment in April of 2014, she refused to surgically remove the bubble from plaintiff's eyeball because "his pressure and . . . sight [was] good" and she had concerns about "complications" that might result from a second surgery. She chose instead to proscribe plaintiff an eye gel.

Similar to Dr. Crump, no allegation against Dr. Singleton evidences an intent to deprive plaintiff of medical care. Just the opposite, she conducted multiple examinations and proscribed the course of treatment that she believed to be best. Failure to accurately diagnos the "rare" form of infection or prevent plaintiff from going blind in his left eye do not suggest a culpable state of mind and thus do not make Dr. Singleton liable under § 1983. *See, e.g.*, *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (explaining that Eighth Amendment deliberate indifference does not cover negligence in diagnosing a medical condition); *Moss v. Minor*, No. 3:11-cv-425, 2011 WL 6258451, at *2 (E.D. Tenn. Dec. 14, 2011) ("'Deliberate indifference' . . . is distinguishable from an inadvertent failure to provide adequate medical care.").

Finally, plaintiff explains that "every request or referral sent to [MCCX] for approval or denial" went "by" either Administrators Walker or Houston-Fagan "or the medical administrator over them" and, based on that fact, suggests that both individuals are "guilty of not providing

13

[him] with the qualified [medical] provider that [he] needed." Noticeably absent from the Complaint is any discussion about the nature and extent of the information that Dr. Crump, plaintiff, and others included in the medical requests that were denied or any allegation that Administrators Walker and Houston-Fagan recognized the severity of plaintiff's condition. Nor does plaintiff allege that either individual was actually the person responsible for denying his requests to see a specialist. *See Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986) (dismissing action for failure to state a claim where the plaintiff did not "make specific allegation against any particular officer").

Conclusory statements of liability unaccompanied by factual assertions in support of the same are incapable of serving as a basis for liability under § 1983. Plaintiff has not stated an Eighth Amendment claim against Dr. Crump, Dr. Singleton, Administrator Walker or Administrator Houston-Fagan. Because no other causes of action remain, they will be dismissed.

### c. Armes, Phillips, and Heidle

Similar to Administrators Walker and Houston-Fagan, plaintiff makes no mention of Coordinator Armes, Warden Phillips, and Deputy Warden Heidle in the section of his complaint describing the numerous attempts and failures at seeing a specialist about the condition of his left eye. Instead, plaintiff only mentions the above individuals in context of the following: (1) his allegation that he "had trouble" with Coordinator Armes because he complained about his "inmate pay being short for three straight months" and filed a grievance to that effect; (2) his allegation that Coordinator Armes offered him a job as an "offender helper," but that he never actually got that job; and (3) his allegation that Coordinator Armes rejected his application for a medical job because all of those positions were filled and that Warden Phillips refused to "open-

14

up another . . . slot." Based on these facts, plaintiff "figure[s]" that Coordinator Armes, Warden Phillips, and Deputy Warden Heidle "transferred [him] to SCCF as a form of revenge."

Nothing in the Complaint suggests that Coordinator Armes, Warden Phillips, or Deputy Warden Heidle knew about the seriousness of plaintiff's medical condition or were aware of his ongoing medical needs and history of seeking medical care from specialists. Because plaintiff does not alleged that these individuals knew about his ongoing medical needs, he has not stated a viable claim for medical deliberate indifference against them based on deprivation of the same.

### d. Williams

Plaintiff names Director Williams in the style of the Complaint and states at the end of the document that he and others at TDOC "are guilty of being informed of [plaintiff's] medical condition and . . . need for professional care, and not exercising their authority to insure that [he] received the care [that he] needed from a qualified eye specialist." Aside from that single conclusory statement, however, the Complaint lacks any factual development regarding how and when Director Williams learned about plaintiff's condition, what authority Director Williams had to remedy the situation or ensure access to specialized treatment, and whether or not Director Williams subjectively understood the severity of plaintiff's condition. Because respondeat superior is not a viable basis for liability under § 1983, Director Williams will be dismissed.

### 3. Actions Taken as a "Form of Revenge and Retaliation"

In addition to the medical negligence, professional malpractice, and deliberate indifference claims discussed above, plaintiff suggests that Coordinator Armes, Warden Phillips, and Deputy Warden Heidle "conspired" to transfer him to SCCF and thereby deprive plaintiff of ongoing medical care at UTMC as a "form of revenge and retaliation" for the grievances that plaintiff submitted in preparation of the instant federal lawsuit and about "shorts" in inmate pay.

15

The Court interprets this allegation as a claim for conspiracy to retaliate in violation of the First Amendment.

"Retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment." *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994). "[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir. 1998). A prisoner states a retaliation claim if he shows that: (1) he engaged in protected conduct, (2) someone took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in such conduct, and (3) the protected conduct motivated the adverse action *Thaddeus v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

A civil conspiracy "is an agreement between two or more persons to injure another by unlawful action." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (citing *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirators shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565 (recognizing that allegations of conspiracy must be supported by facts that give rise to a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008).

Here, pleading a viable claim for conspiracy to retaliate would require that plaintiff set forth a "plausible suggestion" that Coordinator Armes, Warden Phillips, and Deputy Warden agreed to transfer plaintiff from MCCX to SCCF and that his grievances in preparation for the instant lawsuit and in pursuit of additional inmate pay motivated that agreement.

### a. Armes, Phillips, and Heidle

The foundation of plaintiff's allegation of conspiracy appears to be that plaintiff was having "trouble" with Coordinator Armes after he complained about his "inmate pay being short for three straight months," that he was unable to obtain a new job within the prison system despite representations by Coordinator Armes to the contrary, and that Warden Phillips refused to create a new "slot" when Coordinator Armes told plaintiff that all of the medical jobs were filled. Based on these seemingly unrelated occurrences, plaintiff baldly asserts that he "figure[s]" Coordinator Armes, Warden Phillips, and Deputy Warden Heidle "conspired" to have him transferred from MCCX to SCCF as "revenge and retaliation" for submitting numerous grievances.

Noticeably absence from the Complaint is any factual basis or support evidencing a "meeting of the minds" or agreement between the defendants. To the contrary, plaintiff lists several unrelated occurrences and then, without any additional support, makes the conclusory and bare-boned assumption that several of the individuals involved in those earlier events must have conspired against plaintiff in a totally unrelated matter—his transfer from MCCX to SCCF. It is precisely this type of "vague and conclusory allegation[] unsupported by material fact[] [that is] not . . . sufficient to state a [conspiracy] claim under [§] 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *see also Sango v. Place*, No. 2:16-cv-136, 2016 WL 3610487, at *2 (W.D. Mich. July 6, 2016) ("[T]he Court has recognized that although parallel conduct may be

17

consistent with an unlawful agreement, it is insufficient to state a claim where the conduct 'was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009)); *Wallace v. Carlton*, 2:07-cv-246, 2010 WL 1957492, at *5 (E.D. Tenn. May 13, 2010) (rejecting conspiracy to retaliate claim where the allegations lacked specificity and the complaint lacked "any facts to show that there was a 'meeting of the minds' between two or more defendants as to one plan"); *Hurt v. Birkett*, 566 F. Supp.2d 620, 636 (E.D. Mich. July 10, 2008) (dismissing conspiracy claim where the "plaintiff . . . failed to allege [the conspiracy] . . . with any degree of specificity" and omitted any "details or allegations regarding any specific acts in furtherance of that conspiracy").

To the extent that plaintiff intends the discussion about Warden Phillips refusal to "open-up" a new medical job as an independent retaliation claim, that claim fails as a matter of law because plaintiff does not have a constitutional right to the creation of that new position. *Cf. Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (recognizing the right to file grievances)

Because plaintiff has failed to state a viable claim of conspiracy to retaliate against Coordinator Armes, Warden Phillips, and Deputy Warden Heidle and because no other causes of action remain against those defendants, all three of the individuals will be dismissed.

### 4. Remaining Claim Against John Doe Correctional Officer

In addition to the named defendants, the Complaint repeatedly refers to a John Doe correctional officer. The statute of limitations applicable to that defendant has now passed.

Plaintiff has made no effort to amend his complaint to name the John Doe correctional officer or any other TDOC, Centurion, or Corizon employee as a defendant. As such, plaintiff's cause of action against the John Doe correctional officer will be **DISMISSED WITH**

18

**PREJDUCE**. *See Cross v. City of Detroit*, No. 06-11825, 2008 WL 2858407, at *1 (E.D. Mich. July 23, 2008) (dismissing *sua sponte* and with prejudice the plaintiff's claim against John Doe police officer for civil rights violations because the plaintiff "did not seek leave to amend the Complaint to name the John Doe defendant prior to the expiration of the statute of limitations"); *see also Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) (holding that Rule 15(c) of the Federal Rules of Civil Procedure offers no remedy when, like here, plaintiff "simply did not know whom to sue or opted not to find out within the limitations period" and "waited until the last day of the . . . limitations period to file his complaint, [which] left no time to discover the identity of his arresting officers within the relevant time"); *Eady v. Young*, No. 4:12-CV-28, 2013 WL 11328159, at *4 (E.D. Tenn. Feb. 6, 2013) (stating that Rule 15(c) allows relation back for the mistaken identification of defendants, not for "John Doe" defendants).

### III. CONCLUSION

Because Plaintiff is a detainee in the Northeast Correctional Complex, he is herewith **ASSESSED** the civil filing fee of $350.00. Pursuant to 28 U.S.C. § 1915(b)(2), the custodian of Plaintiff's inmate trust account at the institution where he now resides is directed to submit to the Clerk, U.S. District Court, 800 Market Street, Suite 130, Knoxville, Tennessee 37902, twenty percent (20%) of the Plaintiff's preceding monthly income (or income credited to the Plaintiff's trust account for the preceding month), but only when such monthly income exceeds ten dollars ($10.00), until the full filing fee of three hundred fifty dollars ($350.00) as authorized under 28 U.S.C. § 1914(a) has been paid to the Clerk. 28 U.S.C. § 1915(b)(2).

The Clerk is **DIRECTED** to send a copy of this Memorandum to the Warden of Northeast Correctional Complex to ensure that the custodian of plaintiff's trust account complies

19

with that portion of the Prison Litigation Reform Act relating to payment of the filing fee. The Clerk is **DIRECTED** to forward a copy of this Memorandum to the Court's financial deputy.

Although this Court is mindful that a pro se complaint is to be liberally construed, *Haines v Kerner*, 404 U.S. 519, 510–21 (1972), it is quite clear that the plaintiff has not alleged the deprivation of any constitutionally protected right, privilege, or immunity, and therefore, the Court finds his claims to be frivolous under 28 U.S.C. §§ 1915(e) and 1915A. Plaintiff's request to proceed *in forma pauperis* [Doc. 1] will be **GRANTED**. His request for counsel and complaint [Doc. 2] will be **DENIED**; the action [E.D. Tenn. Case No. 3:16-cv-387-TAV] will be **DISMISSED** *sua sponte* for failure to state a viable claim under 42 U.S.C. § 1983.

**AN APPROPRIATE ORDER WILL ENTER.**

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE